IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| TOM JASKIEWICZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:21-cv-00912** |
| | ) | **Judge Aleta A. Trauger** |
| ITG COMMUNICATIONS, LLC, and | ) | |
| BROADBAND TECHNICAL | ) | |
| RESOURCES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Before the court are (1) the Motion for Partial Judgment on the Pleadings (Doc. No. 21) filed by plaintiff Tom Jaskiewicz; and (2) the Motion for Summary Judgment filed by defendants ITG Communications, LLC ("ITG") and Broadband Technical Resources, Inc. ("BTR") (collectively with ITG, "defendants") (Doc. No. 36.) For the reasons set forth herein, the defendants' motion will be granted in part and denied in part, and the plaintiff's motion will be denied.

## I.      FACTS AND PROCEDURAL HISTORY[1]

### A.      Jaskiewicz's Employment and Termination

The parties describe BTR as a "national provider of fulfillment, construction, and project management services to the cable and telecommunications industries." (Compl., Doc. No. 1 ¶ 8;

---

[1] The facts for which no citations are provided are drawn from the plaintiff's Response to the Defendants' Statement of Undisputed Material Facts (Doc. No. 52) or the defendants' Response to the plaintiff's Statement of Material Disputed Facts (Doc. No. 60) and are undisputed for purposes of the Motion for Summary Judgment. All statements of fact recited herein are either undisputed or viewed in the light most favorable to the plaintiff, unless otherwise indicated.

Am. Answer, Doc. No. 31 ¶ 8.) Jaskiewicz became an employee of BTR on or around August 8, 2018. Just over a year later, on August 31, 2019, ITG acquired 100% of BTR. BTR, although wholly owned by ITG, has remained in existence as an ongoing concern. (Doc. No. 1 ¶ 10; Doc. No. 31 ¶ 10.)

On August 29, 2019, in connection with the acquisition of BTR by ITG, Jaskiewicz signed a letter ("Employment Letter") setting forth the post-acquisition terms of his employment with BTR. (Doc. No. 26-1.) This Employment Letter states that Jaskiewicz would be employed by BTR as Executive Vice President of Business Development. Jaskiewicz testified that his job duties included "activities related to marketing, sales, products/service development, and customer service to drive business growth and marketshare." (Doc. No. 36-1, Jaskiewicz Dep. 77.)[2] In particular, his job was to obtain projects from prospective customers, such as telecommunications companies, for the construction, improvement, and expansion of fiber network infrastructure.

The Employment Letter states that Jaskiewicz was to be "paid an annual salary of $150,000 paid bi-weekly in accordance with the BTR payroll schedule. Additionally, [he would] receive 1% of sales made by [him], to be paid out on the payroll following invoicing." (Doc. No. 26-1.) The Employment Letter does not contain any express provision stating that Jaskiewicz would—or would not—continue to receive commission payments after his employment ended. (*See generally id.*)

---

[2] The defendant filed excerpts from several deposition transcripts, rather than complete transcripts (which would have been preferred). The court cites herein the original page numbers of the transcripts, rather than the page numbers assigned by the court's electronic filing system.

The court also notes that both parties have cited page numbers of deposition transcripts that were not actually included within the excerpts that were filed, making it impossible at times for the court to verify whether a disputed statement can be substantiated by either party. The filing of complete transcripts would have avoided this problem.

While employed by BTR, Jaskiewicz was only entitled to a commission for a sale once an invoice was submitted to the customer, and the amount of the commission owed was based on the invoiced amount. In accordance with this practice, Jaskiewicz received commission payments in checks also compensating him for salary payments every two weeks for at least part of the time that he was employed by BTR. Jaskiewicz testified that "[t]hat was the plan" but that, shortly after his employment, he started receiving the commission checks on a monthly basis rather than with his payroll checks, which were issued every two weeks. (Doc. No. 36-1, Jaskiewicz Dep. 84–85.) Then, either in late 2020 or early 2021, he was told that commissions would be paid out on a quarterly basis. (*Id.* at 85.) It is undisputed that neither ITG nor BTR has a practice of making commission payments to employees for invoices sent to customers after the employees are terminated, but it is also undisputed that Jaskiewicz was the only salesperson ever employed by BTR or ITG while the plaintiff was there, and BTR has never hired another person to replace him. (Doc. No. 36-4, Killets Dep. 31.)

On September 3, 2019, also in connection with the acquisition of BTR by ITG, Jaskiewicz signed a Sale Participation Agreement ("SPA") with ITG. (Doc. No. 50-6.) The express purpose of the SPA was "to provide the possibility of incentive compensation to Participant [Jaskiewicz], a key employee of BTR[,] and to benefit the Company by creating performance incentives to the Participant." (Doc. No. 50-6, SPA ¶ 1.) The performance incentives were "based upon the award of units of participation (each a 'Performance Unit'), the value of which is related to the appreciation in the value of BTR and resulting increase in the value of the ITG Enterprise in a sale of the ITG Enterprise." (*Id.*) Under the SPA, ITG granted Jaskiewicz two Performance Units. (*Id.* ¶ 2 & Schedule 1 (Doc. No. 50-6, at 6).) The SPA provides that, although the Performance Units "vested" upon execution of the SPA, they would only become "fully matured" upon the closing of

a "Liquidity Event." (SPA ¶¶ 3–4.) That is, Jaskiewicz would only be entitled to cash out the Performance Units (in accordance with the valuation formula provided in SPA) upon the "Maturity Date"—the date of the closing on a Liquidity Event. The SPA further provides that, to be entitled to any payout, Jaskiewicz had to be employed by BTR on the Maturity Date, unless he had been terminated "without 'Cause'" within one year prior to the Maturity Date. (SPA ¶¶ 3, 6.) For purposes of that limitation, the SPA defines "Cause" as:

> (i) intentional misconduct in violation of written policies or directions of the Chief Executive Officer or Board of Directors of the Company that results in a material adverse impact to the business of BTR, ITG or any entity within the ITG Enterprise; (ii) embezzlement; (iii) the intentional causing of material harm to the Company; (iv) Participant's material breach of Participant's noncompetition agreements or confidentiality obligations contained in such agreements; (v) Participant's continued unsatisfactory performance that results in material adverse impact to the business of BTR, ITG or any entity within the ITG Enterprise following notice and a reasonable period to cure such unsatisfactory performance; (vi) Participant's violation of the Company's or ITG Enterprise's anti-harassment policy; and (vii) Participant engaging in unlawful or fraudulent activities relating to his job.

(SPA ¶ 6(c).)

The SPA defines Liquidity Event as "the sale of all or substantially all of the assets or equity interests of the Company, BTR, and all of the companies constituting the ITG Enterprise to a third party that is not affiliated to any member of the Company as of the Effective Date." (SPA ¶ 4.) It further explains:

> The parties acknowledge that it is the intent of this Agreement to provide the Participant the ability to participate in a bona fide enterprise sale that results in the then-equity holders receiving a profit from such event versus transactions that are entered for other purposes such as raising capital or securing indebtedness.

(*Id.*)

In October 2019, Jaskiewicz provided Kevin Killets, his supervisor and BTR's Chief Operating Officer ("COO"), a Business Development Report summarizing the prospective clients he was pursuing. (*See* Doc. No. 36-1, Jaskiewicz Dep. 88–89; Doc. No. 36-1, at 41.) This Report

identifies Blue Stream, Crown Castle Nashville, and Amazon Web Services ("AWS") as clients Jaskiewicz brought into BTR before its acquisition by ITG and that continued to be clients; AWS is also identified as a client with the potential capacity to bring in an additional $10,000,000 in work. (*See* Doc. No. 36-1, Jaskiewicz Dep. 92–93; Doc. No. 36-1, at 41.) In his deposition, Jaskiewicz was somewhat unclear on whether Atlantic Broadband became a client before or after the ITG acquisition. (*See* Doc. No. 36-1, Jaskiewicz Dep. 90 ("After."); *id.* at 91 ("I believe we started with . . . Atlantic. I'm having confusion with that. There are two companies."); *id.* at 178 (stating affirmatively that "after the acquisition to the time of his termination," he brought in Atlantic Broadband).)[3] Regardless, it is undisputed that, following BTR's acquisition, the relationship with Atlantic Broadband never brought in any additional revenue. (*Id.*)

Following its acquisition by ITG, BTR closed another substantial deal with AWS in early 2020 that would generate, according to Jaskiewicz, $12 million in revenue in 2020 and 2021, $3 million of which was invoiced by August 2021. (*Id.* at 94; Doc. No. 50-5, Jaskiewicz Decl. ¶ 8.) While the exact figures are disputed, Killets testified that AWS was a very lucrative customer for BTR.

Aside from AWS projects, Jaskiewicz confirmed that he did not close a deal with any of the other potential clients identified on his Business Development Report. (*Id.* at 95.) He points out, however, that he did bring in "potential" clients, including Shentel Communications ("Shentel") and "four or five" responses to Requests for Proposals that BTR "turned down summarily for one reason or another." (*Id.* at 178–79.) He also "revitaliz[ed]" the company's relationship with Crown Castle Nashville. (*Id.* at 179.) It is undisputed, however, that the Shentel

---

[3] Whether Jaskiewicz brought in Atlantic Broadband as a client is disputed. According to Kevin Killets, it was brought in prior to the acquisition by a BTR employee in Florida, Ken Keith. (Doc. No. 36-4, Killets Dep. 62.) This dispute is not material.

opportunity ended up being much smaller than Shentel initially represented and in a remote location. Shentel's proposal was rejected by BTR as unprofitable, and the restored relationship with Crown Castle Nashville only brought in $8,000 to $10,000 in revenue.

In September 2020, Mike Brooks, the CEO of ITG and BTR, encouraged Jaskiewicz to pursue opportunities with cooperative electrical companies. (*Id.* at 135.) Jaskiewicz responded that he was already reaching out to several. (*Id.*) He never closed deals with any of them. He testified that he was close with one contact within one such company with which BTR was pursuing a relationship, but he was told to "back off" from his contact, because Troy McClendon was also pursuing the same company. (*Id.* at 136.)

On March 2, 2021, Jaskiewicz distributed a list of potential clients that he said he was pursuing to Troy McClendon, a co-owner of ITG and the Chief Executive Officer ("CEO") of the ITG-affiliated company, Simplicity. (Doc. No. 36-1, at 50–51.) Not counting AWS (which was not a "new" client), Jaskiewicz did not bring in sales from any potential new clients contained on the March 2, 2021 list. (Doc. No. 36-1, Jaskiewicz Dep. 161.)

Jaskiewicz also testified that he spent a substantial amount of time trying to land Verizon as a client. Although BTR bid on multiple projects in 2020, Verizon never awarded a contract to BTR. In addition, according to Jaskiewicz, his attempts to develop business for BTR following its acquisition by ITG were seriously hampered by the Covid-19 pandemic, which had a "substantially negative effect on [the] business in 2020." (Doc. No. 50-5, Jaskiewicz Decl. ¶ 3.) Jaskiewicz states in a declaration that, as of early 2020, "Verizon put a hold on all new business in the United States," and "most companies banned all travel and disallowed face to face meetings . . . . Conferences were cancelled, postponed, or held virtually, and there were countless other examples of the pandemic's effect on the ability of business to carry out sales activities and expansion." (*Id.*)

According to the defendants, Killets first expressed concern to Jaskiewicz about his lack of sales production in a January 2021 telephone discussion. (Doc. No. 36-4, Killets Dep. 45–46; Doc. No. 36-2, Killets Decl. ¶ 3.) Jaskiewicz characterizes this conversation as concerning the "negative impact that the pandemic had inflicted on business opportunities." (Doc. No. 50-5, Jaskiewicz Decl. ¶ 4.) Further, although Killets suggested that Jaskiewicz move to Virginia to focus on AWS projects, from Jaskiewicz's point of view at least, he never at any time criticized Jaskiewicz's job performance. (*Id.*) They never reached an agreement about Jaskiewicz's moving to Virginia.

Chris Perkins, ITG's President, also met with Jaskiewicz in May 2021 to discuss what business opportunities Jaskiewicz was pursuing. Perkins discussed with Jaskiewicz where others at ITG (in particular, Troy McClendon) were finding success in bringing in new business. At that May 2021 meeting, Perkins reviewed one of Jaskiewicz's "Pipeline Reports" of prospective clients with him. Perkins claims that Jaskiewicz informed him at the meeting that he had not spoken with many of the sales prospects that he had listed on his "Pipeline Report." (Doc. No. 36-5 ¶ 5.) Jaskiewicz, to the contrary, avers that he would never have placed a contact on a list that he had not actually called or contacted and did not tell Perkins that he had not contacted the people or companies on his list that were noted as having been contacted. (Doc. No. 50-5, Jaskiewicz Decl. ¶ 6.) Jaskiewicz also maintains that Perkins did not criticize his performance or express disappointment with his efforts during that meeting. (*Id.*)

On July 20, 2021, Killets and Gissel Rivera, ITG's Director of Human Resources, held a Microsoft Teams meeting with Jaskiewicz to discuss a Performance Improvement Plan ("PIP"). (*See* Doc. No. 36-1, at 52–56.) The PIP was emailed to Jaskiewicz during the course of that meeting. The PIP states that its purpose was to "define serious areas of concern," identify "gaps in

[Jaskiewicz's] work performance," and "allow [him] to demonstrate improvement and commitment." (*Id.* at 52.) The only stated "Improvement Goal" on the PIP was to "bring profitable business to the company as per agreement signed on 09/03/2019," the "Expected Outcome/Measurement" of which was identified as "[s]atisfactory increase in revenue/profit base on new business to be brought in by Mr. Jaskiewicz." (*Id.*) The initial "Review Date" was to be fifteen days later, August 4, 2021. (*Id.* at 53.) Under "Timeline for Improvement, Consequences & Expectations," the PIP states:

> The purpose of this Performance Coaching Plan is to clarify the areas of our concern for you and the actions you need to take in order to be returned to good standing status. It is our hope that by establishing clear and measurable action steps/goals, we will enable you to fully meet the expectations of your position. . . .
>
> Tom Jaskiewicz is being placed on a performance improvement plan. Immediate improvement must be noted. At any point during this 30 day review employment may be terminated if improvement is not noted.

(*Id.* at 54.) The PIP expressly expired after thirty days, on August 19, 2021. (*Id.*) However, it also provided that Jaskiewicz could only continue working through that full thirty days if he showed improvement during the first fourteen days. (*Id.*) Killets and Rivera both met with Jaskiewicz again on July 22, 2021 to further discuss any questions he had regarding the PIP.

After that meeting, Jaskiewicz emailed to Rivera another spreadsheet of prospective clients that he was pursuing. Killets testified that, to satisfy the expectations imposed by the PIP, Jaskiewicz would only have needed to bring in one profitable project from the list of the prospective clients identified on the spreadsheet he sent to Rivera. Jaskiewicz failed to bring in any viable business opportunities from the list (or otherwise) over the course of the next thirty days. The one prospective client that Jaskiewicz brought to the table after the issuance of the PIP was Shentel. As indicated above, however, the scope of that proposed project ended up being much smaller than anticipated, and BTR never entered into a contract with Shentel.

Rivera and Killets met with Jaskiewicz via Microsoft Teams on August 23, 2021 to inform him that he was being terminated. The written notice ("Termination Notice") provided to Jaskiewicz during the meeting states that the reason for termination was: "We have not had success acquiring significant new clients in the areas you oversee." (Doc. No. 22-2, at 1.) The Termination Notice also informed Jaskiewicz that he would receive commissions for the third quarter of 2021 if he complied with certain requirements and that he "might be eligible for 1% of gross sales from the start of the project through a 12-month period" related to the potential project with Shentel, if Shentel signed a contract. (*Id.*)

Despite some delay, it is now undisputed that Jaskiewicz received his final salary payment as well as commissions owed on invoices submitted during the third quarter of 2021.

BTR and ITG did not replace Jaskiewicz after he was terminated. Killets testified that BTR decided it did not need a salesperson. (Doc. No. 36-4, Killets Dep. 31.)

Jaskiewicz maintains that no one at BTR or ITG had criticized his performance up until he received the PIP in July 2021. (Doc. No. 50-5, Jaskiewicz Decl. ¶ 2.) The parties dispute whether it would have been possible for Jaskiewicz to secure a new client and have it generate revenue for the company within thirty days. (Doc. No. 60 ¶ 33.)

Jaskiewicz asserts that, throughout the time he was employed by BTR, he worked "diligently and professionally and applied [his] skills as a salesperson to the best of [his] ability." (Doc. No. 50-5, Jaskiewicz Decl. ¶ 7.) He also attests that, through the date of his termination, he continued to work hard to service existing customers and to bring new customers and projects to the company. (*Id.*) He maintains that he brought several potential customers to the company in 2020 and 2021 that either rejected BTR's bids or never received a bid from BTR, because BTR decided not to pursue the opportunity. (*Id.*) Jaskiewicz also backed away from another potential

client, because a different ITG employee had already established a connection with that company. To his knowledge, the defendants never lost an existing or prospective customer because of something Jaskiewicz did or did not do. (*Id.*)

Jaskiewicz testified that his quarterly commission payments were typically no less than $10,000. (Doc. No. 36-1, Jaskiewicz Dep. 199–200.) Because his commission was 1% of sales, a $10,000 commission equates to $1,000,000 invoiced to customers of BTR during the relevant period. (*See* Doc. No. 36-1, Jaskiewicz Dep. 60, 83–84.) His commission check for the third quarter of 2021—the quarter in which he was terminated—was $5,585.50. This means that, during the quarter that he was terminated, BTR/ITG invoiced $558,550 from sales made by Mr. Jaskiewicz.

It is undisputed, for purposes of the defendants' Motion for Summary Judgment, that Jaskiewicz did not cause the defendants to lose any money, aside from the payment of his salary and expenses. (Doc. No. 36-4, Killets Dep. 58, 63.)

### B.     The Oaktree Transaction

Beginning in December 2021, less than twelve months after Jaskiewicz's termination, ITG entered into a series of agreements that ITG characterizes as ultimately resulting in the sale of a 67.4% equity interest in ITG Parent, LLC ("ITG Parent"), a newly formed parent of ITG, to an entity owned by Oaktree Capital Management, L.P. ("Oaktree") (the "Oaktree Transaction"). The parties dispute whether this transaction was a "Liquidity Event" as that term is defined by the SPA. As best the court can ascertain, the undisputed facts regarding this transaction are as follows.

First, ITG Purchaser, LLC ("ITG Purchaser") was formed on September 8, 2021. (*See* Doc. No. 45, Amended and Restated Limited Liability Company Agreement of ITG Purchaser, LLC, at 2.) As of December 2021, ITG Parent was the sole member of ITG Purchaser. (*Id.* at 3.) ITG Parent was apparently formed for this purpose.

On December 29, 2021, the ten individuals owning all of the equity of ITG (the "Contributing Holders") contributed that equity to ITG Parent pursuant to the terms of a Contribution Agreement (Doc. No. 43). The ten Contributing Holders were: Michael Brooks, Peter Giacalone, Christopher Perkins, Michael Lind, Troy McClendon, Chris Cowart, Christy Adkins, Guilherme Elias, Tracey Giacalone, and Jerry Taylor. In exchange for their equity in ITG, the Contributing Holders received: (1) Class A, Class B, and Class C Units of ITG Parent (the "Parent Units") and (2) rights to potential payment in the future under a separately-executed side letter.[4] Thus, under the Contribution Agreement, there was an exchange of equity, but not cash, between two related entities—ITG and ITG Parent. Immediately following the receipt of ITG's equity, ITG Parent transferred that equity to ITG Purchaser, which, as set forth above, was already wholly owned by ITG Parent. (*See* Doc. No. 41, Unit Purchase Agreement 15 ("Prior to the Closing Date, . . . each Seller shall contribute to Parent all of such Seller's right title and interest in and to such Seller's Units . . . , in exchange for the issuance by Parent to each Seller of a number of Parent Units having a value equal to the number of Units contributed to Parent by such Seller, as set forth on Schedule 1.1(a) . . . . Immediately following the contribution by the Sellers of the Units to Parent, Parent shall contribute to ITG Purchaser each of the Units.").)

On December 30, 2021, ITG Splitter, L.P. ("ITG Splitter" or "ITG Splitter/Oaktree"), an entity formed by Oaktree for this purpose, purchased the Class A Parent Units from the Contributing Holders with cash pursuant to a Unit Purchase Agreement. (*See* Doc. No. 41, Unit Purchase Agreement.) The total amount of cash paid to the Contributing Holders in this transaction was more than $204,800,000, with the Contributing Holder with the largest share alone receiving

---

[4] Two of these individuals, Michael Lind and Christy Adkins, received only Parent Class A units only. (Doc. No. 50-4, at 1.)

almost $64 million. (*See* Doc. No. 50-4.) As part of this transaction, the two individuals holding only Class A units sold all of their interest. (*Id.*) According to the defendants, the Class A Parent Units purchased by ITG Splitter represented a 67.4% equity interest in ITG Parent, while eight of the ten Contributing Holders retained the Class B and Class C Parent Units, representing 32.6% of the equity of ITG Parent. (*See* Doc. No. 40, at 9–12.) In other words, according to the defendants, the Oaktree Transaction resulted in the sale of 67.4% of the equity of ITG Parent, which is the sole member of ITG Purchaser, which in turn, is the sole member of ITG. The eight individuals retaining 32.3% equity in ITG Parent in the form of the Class B and Class C Parent Units were Michael Brooks, Peter Giacalone, Christopher Perkins, Troy McClendon, Chris Cowart, Guilherme Elias, Tracey Giacalone, and Jerry Taylor (the "ITG Continuing Equity Holders"). (*See* Doc. No. 40, at 9.) The ITG Continuing Equity Holders collectively retained their equity through ITG Management Holdings, LLC, which was apparently created for that purpose.

The plaintiff purports to dispute in part the above statements. While he agrees that, "[a]s a result of the Oaktree Transaction, Oaktree, through ITG Splitter, LLC was transferred 67.4% of the ownership 'units' of ITG Parent," he disputes that this 67.4% of the ownership units is equivalent to 67.4% of the value of ITG. He contends that ITG Splitter/Oaktree "received 100% of the Class A units, which are more valuable than the other classes of ownership units for several reasons, including: (a) the Class A Units are entitled to profit distributions in the amount of $160 Million; and (b) in the event of a sale, Class B and C Units get no sales proceeds until the capital investment of the Oaktree (the Class A Units) is repaid." (Doc. No. 52, Pl.'s Resp. to Defs.' Statement of Undisp. Material Facts ("SUMF") ¶ 75 (citing, without a pinpoint citation, Doc. No. 50-3, the eighty-two page ITG Parent Operating Agreement).) The plaintiff does reference the "Project Islander" Schedule 1.1(a) (Doc. No. 50-4), which he claims shows that "the value of the

Class A Units and the ownership units held by persons who were not members of ITG as of the 'Effective Date' is not less than 78% of the total value of the ownership units." (Doc. No. 52, Pl.'s Resp. to SUMF ¶¶ 75, 81–82.)

The plaintiff does not explain in his Response to the defendants' Statement of Undisputed Material Facts how he reaches that figure. In his Response in opposition to the Motion for Summary Judgment, he asserts in a footnote that

> [a]ccording to the Second Amended Operating Agreement of ITG (the last operating agreement before the Oaktree Transaction that was provided by Defendants) the members of ITG were Michael Brooks, Peter Giacalone, Christopher Perkins and Christopher Cowart.[5] The combined "retained value" of the equity retained by these persons is $63,584,157.86. The total value of the remaining equity, according to the chart, is $293,319,522.42.

(Doc. No. 50, at 4 n.3. (citing Doc. No. 50-4).) He does not do the math, or even refer to it, but the 78% figure to which he refers appears to be based on the fact that the $63,584,157.96 retained by the four referenced individuals represents 22% of the total $293,319,522.42. Later in his Response, he asserts, nonsensically, that

> ten of the persons listed on the "Project Islander Schedule 1.1(a)" Chart were not members of ITG "as of the Effective Date" of the SPA, August 31, 2019. When the "retained value" of these ten members is removed, the total value transferred to non-members of ITG (as of August 31, 2019) is 78% of the total value.[6]

(*See* Doc. No. 50, at 15.) He also points out that the cash proceeds to the seller at closing, identified on Schedule 1.1(a) as $215,819,422.22, represents approximately 74 % of the total value of the company, based on the "Retained Contribution Value" of the company, $77,500,000, also reflected

---

[5] The plaintiff has not provided evidentiary support for this statement, and neither party filed a copy of the Second Amended Operating Agreement of ITG. Even if the court accepts it as true, however, it is not material.

[6] The court presumes that the plaintiff intended to state that *six* of the ten persons listed on the schedule were not members as of August 31, 2019, as he has already acknowledged that four of them were members as of that date. The plaintiff, again, does not provide proof of that assertion, but the court finds it irrelevant.

on Schedule 1.1(a). (*See id.* ("Although this number is not determinative, . . . the value of the Units transferred to Oaktree is 74% of the total value of the company.").)

In their Response to the plaintiff's Statement of Disputed Material Facts, the defendants point out that the plaintiff does not adequately explain how he arrived at the 78% figure; they also assert that the actual cash to seller at closing was $204,804,287.68, rather than $215,819,422.22 initially projected. (*See* Doc. No. 40, at 8.)[7] In addressing the central premise of the plaintiff's assertion, which is that the percentage of "units" is not necessarily equivalent to the percentage of the overall value of the company, the defendants assert that

> the "value" of the units of ITG Parent are the amount of capital such units represent, and Schedule A to ITG Parent's Amended and Restated Operating Agreement shows that: (1) ITG Splitter, L.P.'s (or Oaktree's) contributed capital reflects a 67.4% ownership interest, subject to future dilution down to 50.4%, and (2) ITG Management Holdings, LLC's contributed capital reflects a 32.6% ownership interest.

(Doc. No. 60, Defs.' Resp. to Pl.'s Statement of Disputed Material Facts ("SDMF") ¶ 3 (citing Doc. No. 40, at 10).)

It is undisputed that the Oaktree Transaction brought in an equity partner (Oaktree) but did not change the actual nature of BTR's or ITG's services. Following the Transaction, the officers of BTR and ITG remained the same, with, for example, Mike Brooks still serving as CEO of both ITG and BTR, Chris Perkins remaining as ITG's President, and Kevin Killets remaining as BTR's COO. Oaktree did not place anyone into officer or employee positions at ITG or BTR.

---

[7] The final Purchase Price reflected on the Project Islander Final Closing Statement incorporates a number of adjustments to the figures estimated on the Preliminary Closing Statement, including Cash, Closing Indebtedness, Working Capital Underage, and Transaction Expenses. (Doc. No. 40, at 8.) It apparently did not affect the cash allocated to the Equity Holders as reflected on the Closing Distribution (Schedule 1.1(a)). (*See* Doc. No. 40, Unit Purchase Agreement § 2.1(d).)

### C.    This Lawsuit and the Pending Motions

Jaskiewicz filed the Complaint initiating this lawsuit on December 9, 2021, before the Oaktree Transaction closed. Count One seeks declaratory relief against ITG, pursuant to 28 U.S.C. § 2201, based on anticipatory breach of the SPA. The plaintiff asserts that he was terminated without cause, as that term is defined by the SPA, and therefore entitled to "profit from a Liquidating Event that occurs no later than one year from the date of his termination." (Doc. No. 1 ¶ 41.) He claims that ITG "repudiated the SPA" by "unequivocally announcing that it did not intend to perform its primary obligation to Mr. Jaskiewicz," apparently based on its position that he was terminated for cause. (*Id.* ¶ 42; *see also id.* ¶ 37.) Jaskiewicz claims entitlement to a declaration that he was terminated without cause and entitled to profit from any Liquidating Event that occurred within a year of his termination. (*Id.* ¶ 43.)

Count Two of the Complaint seeks damages against both ITG and BTR for breach of contract arising from their purported failure to pay Jaskiewicz his final salary payment and third-quarter commission payment for 2021. (Doc. No. 1 ¶¶ 45–53.) It is now undisputed that the defendants have paid the plaintiff all salary and commission earned through the third quarter of 2021 and that this claim has been rendered moot. It will be dismissed on that basis without further discussion or analysis.

Count Three of the Complaint seeks a declaratory judgment that BTR is required to pay Jaskiewicz a one percent commission on "revenues from all sales made by Plaintiff while he was an employee of BTR," "for as long as those sales continue to generate revenue." (Doc. No. 1 ¶¶ 55, 56.)

The plaintiff's Motion for Judgment on the Pleadings (Doc. No. 21) seeks judgment as a matter of law on Count Three, in the form of a declaration that Jaskiewicz's entitlement to commission payments did not terminate with his employment and that he is instead entitled, under

the terms of the agreement embodied in his Employment Letter, to be paid commission on sales made by him for as long as those sales continue to generate revenue. The defendants oppose the Motion for Judgment on the Pleadings. (*See* Doc. No. 26.)

In their Motion for Summary Judgment and supporting Memorandum (Doc. Nos. 36, 37), the defendants assert with respect to Count Three that they, rather than the plaintiff, are entitled to judgment as a matter of law as to the interpretation of the plaintiff's Employment Letter, and that Jaskiewicz's entitlement to commissions terminated with his employment. The defendants argue, with respect to Count One, that Jaskiewicz was terminated for cause and that, in any event, the Oaktree Transaction was not a Liquidating Event, and no other such qualifying event occurred within a year of the plaintiff's termination, thus mooting any claim for a declaration regarding his entitlement to payment under the SPA.[8]

In support of their Motion for Summary Judgment, the defendants filed a Statement of Undisputed Material Facts (Doc. No. 38) and evidentiary material to support their factual assertions, much of it under seal. The plaintiff filed a Response in opposition to the Motion for Summary Judgment, Response to the defendants' Statement of Undisputed Material Facts, and his own Statement of Disputed Material Facts. (Doc. Nos. 50, 52.) The defendant has filed a Reply and a Response to the plaintiffs' Statement of Disputed Material Facts. (Doc. Nos. 59, 60.)

## II.     STANDARD OF REVIEW

### A.     Rule 56

Summary judgment is appropriate where there is no genuine issue as to any material fact

---

[8] The plaintiff, inexplicably, did not seek to amend his pleading to seek a declaration to the effect that the Oaktree Transaction was a Liquidating Event under the SPA or that ITG breached the SPA by failing to pay him the Performance Units as required by the SPA. The defendants have not raised this issue, and the parties appear to presume that the pleading has been amended by implication to incorporate a breach of contract claim based on the Oaktree Transaction.

and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

### B.     Rule 12(c)

Rule 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A motion for judgment on the pleadings pursuant to Rule 12(c) is subject to the same standards of review as a Rule 12(b)(6) motion to

dismiss for failure to state a claim upon which relief can be granted. *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998). "For purposes of a Rule 12(c) motion, all well-pleaded material allegations must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Stafford v. Jewelers Mut. Ins. Co.*, 554 F. App'x 360, 370 (6th Cir. 2014) (internal citation and quotations omitted). Moreover, "[a] Rule 12(c) motion is appropriately granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Id.*

## III. DISCUSSION

All of the claims remaining at issue in this case are premised upon breach of contract. The questions posed by the parties' motions are: (1) whether Jaskiewicz was terminated without "cause," as that term is defined by the SPA; (2) if so, whether the Oaktree Transaction qualifies as a Liquidity Event; and (3) whether Jaskiewicz is entitled to commissions on the revenue "from all sales made by Plaintiff while he was an employee of BTR for so long as those sales continue to generate revenue." (Doc. No. 1 ¶¶ 56, 58.) Each of these questions requires the interpretation and/or construction of the relevant contracts: the SPA and the plaintiff's Employment Letter.

### A. Legal Standards

The SPA expressly provides that it is to be governed by Tennessee law. (Doc. No. 36-1, at 36, SPA ¶ 12(d).) The Employment Letter does not specify which state's laws govern its construction, but both parties appear to presume that Tennessee law applies.

The "interpretation" of an agreement, or a term used in an agreement, "involves ascertaining the meaning of contractual words." 11 Williston on Contracts § 30:1 (4th ed.) (citations omitted). "Construction," on the other hand, "involves deciding their legal effect." *Id.* "In 'resolving disputes concerning contract interpretation, [the court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual

language.'" *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889–90 (Tenn. 2002) (quoting *Guliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)).

The first order of business in interpreting a contract is "to determine whether the language of the contract is ambiguous." *Id.* at 890. "If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes," and "[a] strained construction may not be placed on the language used to find ambiguity where none exists." *Id.* at 890, 891 (citations omitted). "A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." *Id.* (quoting *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190–91 (Tenn. 1973)). "This determination is made on an objective basis, not based on the parties' subjective perceptions." 17A C.J.S. Contracts § 404. *See also* 11 Williston on Contracts § 30:6 ("[I]t is not the parties' subjective intent but rather their objective intent, embodied in the language that they used to memorialize their agreement, that is relevant [to the determination of whether a contract is ambiguous].").

Only if the contract is ambiguous is the court called upon to "appl[y] established rules of construction to determine the parties' intent." *Id.* If ambiguity remains after that effort, the legal meaning of the contract "becomes a question of fact appropriate for a jury." *Id.* (internal quotation marks and citation omitted). Otherwise, the determination of the parties' intention "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.*, 78 S.W.3d at 890.

### B. Whether Jaskiewicz Was Terminated for Cause

As set forth above, the SPA defines "cause" as:

(i) intentional misconduct in violation of written policies or directions of the Chief Executive Officer or Board of Directors of the Company that results in a material adverse impact to the business of BTR, ITG or any entity within the ITG Enterprise;

> (ii) embezzlement; (iii) the intentional causing of material harm to the Company; (iv) Participant's material breach of Participant's noncompetition agreements or confidentiality obligations contained in such agreements; (v) Participant's continued unsatisfactory performance that results in material adverse impact to the business of BTR, ITG or any entity within the ITG Enterprise following notice and a reasonable period to cure such unsatisfactory performance; (vi) Participant's violation of the Company's or ITG Enterprise's anti-harassment policy; and (vii) Participant engaging in unlawful or fraudulent activities relating to his job.

(Doc. No. 50-6, at 3.) The defendants do not remotely contend that Jaskiewicz engaged in intentional misconduct of any kind. Thus, the only subpart of this definition of relevance here is the fifth: whether Jaskiewicz engaged in "continued unsatisfactory performance that result[ed] in material adverse impact to the business of BTR, ITG or any entity within the ITG Enterprise following notice and a reasonable period to cure such unsatisfactory performance."

Breaking down this provision into its component parts, it required (1) not one instance of unsatisfactory performance, but continued unsatisfactory performance; (2) that such unsatisfactory performance continued following notice and a reasonable opportunity to cure; and (3) that the unsatisfactory performance caused a materially adverse impact on the defendants' business. The defendants argue that Jaskiewicz's performance was unsatisfactory because he failed to bring in a *profitable* project from any new client over the course of two years, and, while he did reestablish BTR's relationship with one client, Crown Castle Nashville, that relationship brought in a total of $8,000 to $10,000 in revenue. The defendants maintain that this figure is "by any definition unsatisfactory." (Doc. No. 37, at 16.) They also argue that this unsatisfactory performance had a materially adverse impact on the defendants, insofar as they continued to pay Jaskiewicz a six-figure annual salary plus benefits over the course of two years, despite his failure to bring in new business. Regarding notice, the defendants insist that Jaskiewicz's complete lack of sales in and of itself should have been sufficient notice of his deficient performance. Aside from that, they point to Killets' "suggestion" in January 2021 that Jaskiewicz move from a sales role to an operations

role. (*Id.*) As for the opportunity to cure, the defendants reference the PIP and assert that, if Jaskiewicz had succeeded in bringing in even one new client during that thirty-day time frame established by the PIP, "his job would have been saved." (*Id.* at 17.)

The court finds that there is at least a material factual dispute as to whether the plaintiff was terminated for "cause" as that term is defined by the SPA. First, the court notes that all of the other enumerated parts of the definition of cause involve intentional misconduct, suggesting that the type of conduct for which termination for cause is warranted should, at a minimum, fall within Jaskiewicz's control. Here, while there is no doubt that the defendants were subjectively dissatisfied with Jaskiewicz's undisputed failure to develop new clients, Jaskiewicz has produced evidence that he worked consistently and diligently throughout his tenure; that his work with AWS brought in a substantial amount of revenue, including new projects, after BTR was acquired by ITG; and that his efforts to develop new business were significantly hampered by the Covid-19 pandemic. In other words, while the *results* of Jaskiewicz's work efforts were unsatisfactory, there is no evidence in the record that Jaskiewicz's actual *work efforts* were unsatisfactory. And the defendants have not suggested any efforts Jaskiewicz should have undertaken that would have yielded greater success. To the contrary, Killets' testimony strongly implies that the only reason Jaskiewicz was hired after BTR was acquired by ITG was because the defendants hoped that he would be able to bring in business from Verizon. Those hopes did not materialize, largely because Verizon did not consider BTR to be big enough to meet its needs, not because Jaskiewicz was not working hard enough. (*See* Doc. No. 60, at 24–25, Killets Dep. 23–24.) A reasonable jury could infer from Killets' testimony that Jaskiewicz was terminated when it became clear that he would not be able to help bring in Verizon.

Second, the only adverse impact to which the defendants point is that they continued to pay Jaskiewicz's $150,000 salary, benefits, and commission for two years. However, the evidence in the record strongly suggests that the revenue generated for the company through Jaskiewicz's continued work with AWS and other clients far exceeded his salary, benefits, and commission. As set forth above, Jaskiewicz testified that his one percent quarterly commission payments were typically at least $10,000 (Doc. No. 36-1, Jaskiewicz Dep. 199–200), which equates to customer invoicing in the amount of $1,000,000 during that quarter (*see id.* at 60, 83–84). While the amount of his final commission check—$5,585.50—was less, even that figure indicates that the defendants invoiced $558,550 in connection with sales made by Jaskiewicz during his final quarter of employment. There is no evidence in the record regarding BTR's net profit from these projects, but it is at least plausible that it more than offset the cost of Jaskiewicz's salary, benefits, and commission. Thus, there is a material factual dispute as to whether his unsatisfactory performance caused a materially adverse impact on the defendants' business.

And finally, a jury could find that the plaintiff did not receive advance notice that the defendants were dissatisfied with his efforts until his receipt of the PIP, giving him thirty days to improve his performance. According to the plaintiff, a thirty-day notice period was not sufficient, given the length of time it typically takes to land a new customer that BTR would consider worth its while. The plaintiff further points out that he brought Shentel to the table during that time frame. Shentel had represented its proposed project as being much bigger than it actually was, and BTR ultimately chose not to submit a bid to it. The defendants blame the plaintiff for this failure, but a jury could find otherwise.

In sum, the court finds that there is a material factual dispute as to whether the plaintiff was terminated for cause. The court must, therefore, move on to consider whether the Oaktree

Transaction qualified as a Liquidity Event under the SPA.

### C.     Whether the Oaktree Transaction Was a Liquidity Event

For purposes of the SPA,

> "Liquidity Event" means the sale of all or substantially all of the assets or equity interests of the Company, BTR, and all of the companies constituting the ITG Enterprise to a third party that is not affiliated to any member of the Company as of the Effective Date.

(Doc. No. 50-6, at 2.) In addition, the SPA expressly states that

> it is the intent of this Agreement to provide the Participant the ability to participate in a bona fide enterprise sale that results in the then-equity holders receiving a profit from such event versus transactions that are entered for other purposes such as raising capital or securing indebtedness. Accordingly, for the avoidance of doubt or confusion, a transaction or sale involving the sale or transfer of Company assets or membership interests that do not involve the then members personally receiving cash or other compensation shall not qualify as a Liquidity Event.

(*Id.*)

The plaintiff contends that the Oaktree Transaction constitutes a Liquidity Event under this definition and that, because he was terminated without cause within a year of the closing on that transaction, he is entitled to payment under the terms of the SPA. The defendants seek summary judgment on this claim on the basis that the Oaktree Transaction resulted, ultimately, in the sale to ITG Splitter (formed by Oaktree for this purpose) of 67.4% of the equity of ITG Parent, which was the sole member of ITG Purchaser, which, in turn, was the sole member of ITG. They assert that, as a matter of contract interpretation, 67.4% of the equity clearly and unambiguously does not qualify as "all or substantially all of the assets or equity interests of the Company." In addition, the defendants characterize the Oaktree Transaction as simply "bring[ing] on an equity partner" without "chang[ing] the actual nature of BTG's or ITG's services. (Doc. No. 37, at 10.)

In response, the plaintiff argues, first, that the defendants mischaracterize the Oaktree Transaction. He asserts that the transaction was, in reality, a complex series of transactions,

pursuant to which

> 100% of ITG's equity interests were sold first to ITG Parent, then to ITG Purchaser. The members of ITG just prior to the Oaktree Transaction now own none of the equity interest of ITG. Rather, they each own a portion of the equity of ITG Management Holdings, which owns all of the Class B and C Units of ITG Parent.

(Doc. No. 50, at 9.) The upshot of this series of transactions, according to the plaintiff, was that "*all* of the equity interest of ITG" was sold. (Doc. No. 50, at 10.) He maintains that this portion of the transaction alone qualifies as a Liquidity Event.

This argument is without merit. First, the defendants do not pretend that the Oaktree Transaction was anything other than a complex series of transactions, the initial portion of which entailed the conveyances to which the plaintiff refers. That portion indeed involved two levels of parent entities and the transfer of equity interests, but it did not involve the exchange of any cash, nor did it result in any profit to the Equity Holders. The transaction up to this point involved the transfer of equity only and did not affect the actual ownership or percentage of ownership of ITG by the then-equity holders. Under the SPA, again, "a transaction or sale involving the sale or transfer of Company assets or membership interests that do not involve the then members personally receiving cash or other compensation shall not qualify as a Liquidity Event." (Doc. No. 50-6, at 2.) The then members did not receive anything to increase the value of the ownership interests they already had. The form of that ownership simply changed. This portion of the Oaktree Transaction was not a qualifying Liquidity Event.

Second, the plaintiff contends that, since all of ITG's equity was first "sold" to ITG Purchaser, and ITG Purchaser was not "affiliated to any member of the Company as of the [August 31, 2019] Effective Date" of the SPA, this sale constituted a Liquidity Event under the SPA, even before the cash transaction involving ITG Splitter. (*Id.* at 11.) This argument, too, is a red herring. Again, ITG's equity was not "sold" to ITG Purchaser, so the question of whether ITG Purchaser

was "affiliated to any member" of ITG as of August 31, 2019 is simply irrelevant.

Third, Jaskiewicz argues that, even if the court "ignores the fact that 100% of ITG's equity is now owned by a[] third-party that is not an affiliate of any previous member of ITG," the term "substantially all" as used in the SPA is ambiguous. Because it is ambiguous, he contends, the term must be construed against the drafter. Moreover, he asserts that the parties' true intent is revealed by the explanatory phrase that expressly states that the parties' intent is that "Participant"—i.e., Jaskiewicz—have "the ability to participate in a bona fide enterprise sale that results in the then-equity holders receiving a profit from such event," which he claims "unequivocally demonstrates that the intent of the SPA was to allow non-equity holders such as Mr. Jaskiewicz to participate in any equity sale that resulted in the equity holders receiving cash." (Doc. No. 50, at 14.) He points out that the individual equity holders whose Class A units were conveyed to ITG Splitter/Oaktree received substantial amounts of cash, with the largest holder alone receiving almost $64,000,000.

This argument fails to account for the substantial body of caselaw from numerous jurisdictions and myriad contexts construing the phrase "all or substantially all" of an entity's assets or equity to mean, at a minimum, substantially more than two-thirds or even three-quarters of such assets or equity. *See, e.g.*, *Handy & Harman v. Burnet*, 284 U.S. 136, 139–40 (1931) (holding that 75% of stock shares was not "substantially all" for purposes of corporate affiliations under federal tax statutes); *Cont'l Can Co., Inc. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund*, 916 F.2d 1154, 1158 (7th Cir. 1990) (in the context of applying an exception to withdrawal liability for employers withdrawing from funds where "substantially all" of a fund's assets come from employers primarily engaged in long and short haul trucking industry, finding that "substantially all" required that 85% of a fund's assets come

from such employers); *Ice Serv. Co. v. Comm'r of Internal Revenue*, 30 F.2d 230, 230 (2d Cir. 1929) (in the context of determining when two corporations are affiliated for tax purposes, holding that substantially all means all except "a negligible minority"); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562, *4 (N.D. Ohio July 9, 2010) (holding, in the context of Social Security disability analysis, that "[s]ubstantially all means 'essentially all' as opposed to 'in the main' or 'for the most part'"); *Fagg v. Bartells Asbestos Settlement Tr.*, 339 P.3d 207, 211 (Wash. App. 2014) (considering the application of the Washington Products Liability Act and whether "substantially all" of the plaintiff's exposure to asbestos occurred before its passage, noting that under the Model Business Corporation Act, "the term 'substantially all' was intended to mean 'nearly all'" (citing Model Bus. Corp. Act § 12.01 cmt. 1 (1984)); *Theurer v. Bd. of Review*, 725 P.2d 1338 (Utah 1986) (finding as matter of law that a newly practicing dentist's acquisition of 75% of former dentist's assets did not involve "substantially all" assets of former dentist, for purposes of Utah's Employment Security Act and the calculation of the plaintiff's contributions to the Unemployment Compensation Fund); *James v. McCoy Mfg. Co.*, 431 So.2d 1147, 1149 (Ala. 1983) (a corporation's acquisition of 65% of another employer's assets was not "substantially all" as a matter of law, for purposes of contribution to the state unemployment compensation fund). Collectively, this body of caselaw suggests that, while "substantially all" might, theoretically, be ambiguous if the figure at issue constituted somewhere between 85 and 90% of ITG's equity or assets, 67.4%, on its face and as a matter of law, does not qualify as "substantially all." The court finds, without attempting to quantify a precise figure that would amount to "substantially all," that 67.4% is not enough.

The plaintiff makes no attempt to argue to the contrary. Instead, he attempts to inject ambiguity into the term "all or substantially all" by referencing the SPA's statement that the

parties' intent in executing the agreement was to "provide the Participant the ability to participate in a bona fide enterprise sale that results in the then-equity holders receiving a profit from such event." He seems to be suggesting that any sale to a third party of any amount of equity that resulted in *any* cash profit to the equity holders, no matter how negligible, would qualify as a Liquidity Event. This argument, too, is unavailing. It is a well established rule of contract construction that "[p]rovisions in a contract 'should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract.'" *Fisher v. Revell*, 343 S.W.3d 776, 779 (Tenn. Ct. App. 2009) (quoting *Guiliano*, 995 S.W.2d at 95). As the court noted in *Fisher*,

> [a] word or expression in the contract may, standing alone, be capable of two meanings and yet the contract may be unambiguous. Thus, in determining whether or not there is such an ambiguity as calls for interpretation, the whole instrument must be considered, and not an isolated part, such as a single sentence or paragraph. The language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.

*Id.* at 780 (quoting 77 C.J.S. Contracts § 304).

To read the sentence referring to equity holders "profit[ing] from such event" as the sole criterion for determining whether a Liquidity Event occurred would be to read out of existence the requirement that the event involve the transfer of "all or substantially all" of the company's assets or equity. Moreover, the context of the statement makes it clear that the reference to profit is intended to distinguish a transfer of equity only that does not result in any amount of profit to the equity holders. Reading the entirety of this paragraph harmoniously, the court finds no ambiguity. On its face, it defines a Liquidity Event as requiring *all* of the following: (1) the transfer of "all or substantially all" of ITG's assets or equity—meaning substantially more than two-thirds of its assets or equity; (2) the transfer must be made "to a third party that is not affiliated to any member of the Company as of the Effective Date" of the SPA (August 31, 2019); and (3) the equity holders

must receive a "profit from such event" in the form of "cash or other compensation," rather than simply an exchange of equity. (Doc. No. 50-6, at 2.) While the equity holders undoubtedly profited substantially from the Oaktree Transaction, they did not collectively transfer all or substantially all of their equity interests in ITG in the Oaktree Transaction—eight of the ten remained equity holders with a substantial stake in the business.

Next, while the plaintiff does not attempt to refute the principle that 67.4% does not qualify as "substantially all" of ITG's assets or equity, he claims that substantially more than just 67.4% of ITG's equity was actually conveyed to ITG Splitter/Oaktree, based on the calculations referenced in the discussion of facts, above. More specifically, he contends that, based solely on the dollar figures assigned by the parties, 74% of ITG's equity was conveyed to Oaktree. He then points to the 78% figure, which he derives based on his (unsupported) assertion that the value "retained" by individuals who were equity holders when the SPA was executed was only 22%, meaning that 78% of ITG's total value was transferred to individuals or entities that were not members of ITG as of the "Effective Date" of the SPA.

Regarding the 78% argument, the plaintiff is attempting to fall back on the SPA's reference to a conveyance to a third party not "affiliated to any member of the Company as of the Effective Date." This proposition, as indicated above, is a red herring. A Liquidity Event under the SPA requires a "sale" of ITG assets to a third-party who was not affiliated with ITG at the time of the SPA. Regardless of when the equity holders identified on Schedule 1.1(a) of the Unit Purchase Agreement acquired their interest, they did not do so in the course of a "Liquidity Event"—nor does the plaintiff argue otherwise. And the question of whether a Liquidity Event occurred in December 2021 depends on whether all or substantially all of ITG's assets or equity was sold to a qualifying third party during the Oaktree Transaction, not how much was retained by individuals

who were equity holders in 2019. In short, the plaintiff has not established the existence of a material factual dispute as to whether 78% of ITG's assets or equity was sold in the course of the Oaktree Transaction. Moreover, even if the court accepted that 78% of its asserts were sold, 78% still does not qualify as "all or substantially all" of ITG's assets or equity.

For the same reason, the plaintiff's assertion that the value of the interest sold to ITG Splitter/Oaktree was actually 74% does not establish a material factual dispute as to whether all or substantially all of the assets were conveyed. First, 74% is not enough. And second, as the defendants persuasively argue, the contributed capital figure ($160,000,000) and the ownership percentage agreed to by the parties to the transaction (67.4%) "is certainly a more accurate reflection of [ITG Splitter/Oaktree's] membership interest in ITG Parent than the sales proceeds in connection to the Oaktree Transaction." (Doc. No. 59, at 13.)

Finally, the plaintiff points to the fact that other holders of similar SPAs who were still employed by BTR or ITG at the time the Oaktree Transaction closed received bonus payments around the time of the closing as evidence of the defendants' intention to treat the Oaktree Transaction as a Liquidating Event. Again, not so. The evidence establishes that the defendants gave discretionary bonuses to a large number of employees, including employees who had not signed SPAs like the plaintiff's, and they were given only to individuals who were still employed at the time of the closing of the Oaktree Transaction. (Doc. No. 36-7, Rivas Dep. 45–46, 54–56.) Because the Oaktree Transaction was not a Liquidity Event under those SPAs but did involve the sale of a substantial amount of ITG's equity, the bonus payments to employees with SPAs were contingent upon modification of their SPAs. Specifically, the employees with SPAs executed a Sales Participation Payment and Release Agreement ("Release") that expressly recognized that the amount paid to the recipient as a bonus did not reflect the amount that would have been paid under

the SPA if a Liquidity Event had occurred and contemplated a modification of the payment that would be made if a Liquidity Event did occur in the future. (*Id.* at 57–58; *See also* Doc. No. 42, Rivas Dep. Ex. 10.) Thus, the payment of bonuses to individuals both with and without SPAs does not support the plaintiff's contention that the defendants viewed the Oaktree Transaction as a Liquidity Event.

In sum, the basic facts are undisputed, and the terms of the SPA are unambiguous. The Oaktree Transaction did not involve the sale of all or substantially all of ITG's assets or equity and, therefore, did not trigger ITG's payment obligation under the SPA, irrespective of the fact that the plaintiff has established at least a question of fact as to whether he was terminated for cause. Because there is no dispute that no other qualifying event occurred within the year following the plaintiff's termination, Count One of the Complaint, seeking a declaration that the plaintiff was not terminated for cause and was entitled to profit from any Liquidity Event occurring within one year of his termination, is therefore moot. The defendant is entitled to summary judgment on this claim.

**D.       Whether Jaskiewicz Is Entitled to Post-Termination Commission**

As set forth above, while Jaskiewicz was at all times an at-will employee, the terms of his employment were documented by an offer letter that was signed by the plaintiff, thus documenting his acceptance of those terms. This signed Employment Letter provides in relevant part:

> You will be paid an annual salary of $150,000 paid bi-weekly in accordance with the BTR payroll schedule. Additionally, you will receive 1% of sales made by you, to be paid out on the payroll following invoicing.

(Doc. No. 26-1, at 2.) Although the Employment Letter states that the 1% commission would be "paid out on the payroll following invoicing" (*id.*), the evidence of record indicates that the defendants' actual practice deviated from that expectation, first moving to monthly commission

payments, and then to quarterly commission payments.[9]

In his Motion for Partial Judgment on the Pleadings and in his Response to the defendants' Motion for Summary Judgment, the plaintiff argues that the Employment Letter "does not limit the payment of commission to the duration of Plaintiff's employment nor place any other time restriction on the payment of commission." (Doc. No. 22, at 3; *see also* Doc. No. 50, at 19–20.) He argues that, under Tennessee law, his right to be paid commission did not end with the termination of his employment but continues for as long as the sales he made "continue to generate revenue." (Doc. No. 22, at 4.) He contends that the statement in his Termination Letter corroborates his interpretation of the Employment Letter, insofar as it provides that he would be "eligible for 1% of gross sales from the start of the project through a 12-month period" if Shentel signed a contract with BTR. (*Id.* (quoting Doc. No. 22-1).)

In their Response to the Motion for Partial Judgment on the Pleadings, the defendants argue that judgment on the pleadings is not warranted, because the Letter Agreement is ambiguous, such that its construction will require the court to resort to extrinsic evidence, including parol evidence and evidence of the parties' statements and conduct regarding the Employment Letter. (Doc. No. 26, at 7.) They argue that the Employment Letter says nothing about how the parties construed the phrase "sales made by" the plaintiff or their intention regarding when the plaintiff's entitlement to commissions would end. They also argue that the most natural reading of the Employment Letter is that "it does not extend to revenues that post-date Plaintiff's termination because Plaintiff was not involved in the generation of those particular revenues (*i.e.*, they were not 'sales made by

---

[9] The plaintiff's Termination Notice stated that Jaskiewicz might be "eligible for 1% of gross sales" related to a contemplated project involving "potential client named 'Shentel Communications'" for a "12-month period should the client sign a contract." (Doc. No. 22-2, at 1.) Because BTR never entered into a contract with Shentel, no such commissions ever became due.

[Plaintiff]')." (*Id.*) In support of their own Motion for Summary Judgment, the defendants further argue that (1) the Employment Letter unambiguously contemplates that Jaskiewicz would have to be employed to receive commission payments; (2) his termination for cause obviates any purported obligation on the part of the defendants to pay future commissions; and (3) all available extrinsic evidence indicates that the defendants do not have a practice of paying post-termination commissions. The parties also dispute whether the case law cited by each other is relevant or on point.

The court has already found that there is at least a question of fact as to whether the plaintiff was terminated for cause, so the defendants' second argument gets it nowhere. Its third argument lacks persuasion because there is no evidence that the defendants hired other salespersons or paid commission to any other employees, so the fact that the plaintiff cannot show that they paid post-termination commission to other individuals is of questionable relevance.

And the defendants' first argument in its Motion for Summary Judgment is simply incorrect as a matter of Tennessee law, under which, absent an agreement to the contrary, an employee's contractual entitlement to continued commissions continues post-termination. *See, e.g.*, *Winkler v. Fleetline Prods., Inc.*, 859 S.W.2d 340, 341, 343 (Tenn. Ct. App. 1993) (where the plaintiff was hired to "procure customers" for the defendant and entitled pursuant to the parties' agreement to a commission on all work performed for those customers, holding that this agreement did not terminate upon the termination of the plaintiff's employment and that the plaintiff was entitled to continue to receive post-termination commissions on revenue generated by repeat orders from the customers procured by the plaintiff during his employment); *Reid v. Express Logistics, Inc.*, No. W2001-00236-COA-R3CV, 2001 WL 1516980, at *3 (Tenn. Ct. App. Nov. 26, 2001) ("Absent agreement to the contrary, [an employer] must continue to pay [a terminated employee]

postemployment commissions on sales [he] made while employed by [the defendant]." (citing *Winkler*, 859 S.W.2d at 341–43, and *Westfall v. Brentwood Serv. Grp., Inc.*, No. E2000-01086-COA-R3-CV, 2000 WL 1721659 (Tenn. Ct. App. Nov. 17, 2000) (extending *Winkler* to case in which the employee resigned rather than being terminated)). Based on this law, the court concludes that, because the Employment Letter does not specify to the contrary, Jaskiewicz is entitled to continue to receive post-termination commissions on "sales made by" him, to be paid following invoicing, regardless of when such invoicing occurs. If the "sale" was made by Jaskiewicz, he is entitled to a commission.

That conclusion does not lead inexorably to a judgment as a matter of law in the plaintiff's favor on Count Three of the Complaint. In that Count, the plaintiff demands a declaratory judgment that BTR is required to pay Jaskiewicz a one percent commission on "revenues from all sales made by Plaintiff while he was an employee of BTR," "for as long as those sales continue to generate revenue." (Doc. No. 1 ¶¶ 55, 56.) There is no evidence in this case, one way or the other, regarding whether sales made by him continue to generate revenue. If not, the plaintiff's demand for a declaration would be moot. In addition, as the defendants argue in response to the plaintiff's Motion for Partial Judgment on the Pleadings, the Employment Letter says nothing about how the parties intended the phrase "sales made by" the plaintiff to be construed. The Employment Letter, on its face, appears to provide that Jaskiewicz's entitlement to a commission is tied, not to his procurement of *customers*, and thus to all sales made to such customers, but to his procurement of *sales*. Tennessee caselaw recognizes the importance of this distinction. *See, e.g.*, *Winkler*, 859 S.W.2d at 341–43. In asserting that he is entitled to commission for as long as his "sales continue to generate revenue," Jaskiewicz might be conflating the concept of revenue generated by *sales* with the concept of revenue generated by *customers* he brought in that continued to engage in new

projects with BTR. But it is not clear from the record that he is wrong, because there is no evidence before the court regarding the parties' intent as to the meaning of the term "sale" as it used in the Employment Letter or how they computed Jaskiewicz's commission payments while he was employed—whether the commission payments were based on the value of initial contracts signed by customers as a result of his effort or were based on all business from clients Jaskiewicz procured,[10] regardless of whether he was personally involved in subsequent projects, based on his being considered the procuring cause of such sales. The court finds that the use of the word "sale" used in the context of the Employment Letter is ambiguous, as it could mean either of these things, or perhaps something else entirely. The parties' conduct that "reflects their understanding of the contract's meaning" is relevant extrinsic evidence that could shed light on how the term should be interpreted here. Williston on Contracts § 30:1 (4th ed.).; *see also Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 700 (Tenn. 2019) (recognizing that "the post-contract conduct of the parties can, in some circumstances, elucidate the parties' own interpretation of their agreement").

In short, while it is clear that Jaskiewicz is entitled to a one percent commission on all sales made by him, upon the invoicing of those sales and regardless of when that invoicing occurs, he is not entitled to judgment as a matter of law on his claim for continued commissions for as long as the sales he made "continue to generate revenue" (Doc. No. 22, at 4), because it is unclear (1) how the term "sales" as used in the Employment Letter should be construed; (2) whether it

---

[10] *See KBD & Assocs. v. Great Lakes Foam Techs., Inc.*, 816 N.W.2d 464, 468 (Mich. Ct. App. 2012) ("The law in Michigan is that sales agents are entitled to post-termination commissions for sales they procured during their time at the former employer." (citation omitted)); *McFeely v. Seneca Wire & Mfg. Co.*, No. 07-10596, 2008 WL 2355602, at *5 (E.D. Mich. June 5, 2008) (holding that, under Michigan law, if the contract is silent on the issue of termination of a commission agreement, the "the agent is entitled to recover a commission on a sale . . . if the agent shows that he was the "'procuring cause' of the sale" occurring following his termination).

encompasses new projects with clients he procured, regardless of whether he was involved in the negotiation of those contracts; and (3) whether any such "sales," however construed, continued to be generate revenue following his termination.

     Neither party is entitled to judgment in its favor on Count Three of the Complaint.

## IV.    CONCLUSION

     For the reasons set forth herein, the court will deny the plaintiff's Motion for Partial Judgment on the Pleadings (Doc. No. 21) and grant in part and deny in part the defendants' Motion for Summary Judgment (Doc. No. 36). An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge